RECEIVED

JUL 1 8 2012

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| REBECCA A. CONCIENNE | CIVIL ACTION NO. 10-1547 |
| VERSUS | JUDGE DOHERTY |
| JERRY L. HOFFPAUIR, MORGAN CITY HARBOR AND TERMINAL DISTRICT | MAGISTRATE JUDGE HILL |

## MEMORANDUM RULING AND ORDER

Pending before the Court is the Motion for Summary Judgment [Doc. 28] filed by defendants Morgan City Harbor and Terminal District ("the District") and Jerry L. Hoffpauir ("Hoffpauir"). Without elaborating in their motion, defendants move "for summary judgment," arguing "there is no genuine issue of material fact, and Defendants are entitled to judgment as a matter of law," without specifically identifying as to what issue or issues. Plaintiff Rebecca A. Concienne ("plaintiff") filed an opposition brief [Doc. 30], and defendants filed a Motion for Leave to File Reply Brief [Doc. 31], which is GRANTED herein.

For the following reasons, defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

## I.      Factual and Procedural Background

The instant lawsuit is essentially a constructive discharge case. Plaintiff was employed as an operations assistant by the Morgan City Harbor and Terminal District ("the District"), working specifically for defendant Hoffpauir. From the record, it appears plaintiff and Hoffpauir were friends before the plaintiff was hired. However, plaintiff alleges after voicing certain complaints about Hoffpauir on the job, including that he was violating the Louisiana public bid law, she was retaliated against and eventually was forced to resign her job because of intolerable working conditions.

The following facts are undisputed:

- The District operates the Port in Morgan City. The District was created as a political subdivision of the State of Louisiana in 1952. Its enabling legislation is found at La. R.S. §34:321. The District's Board consists of nine commissioners who are appointed by the City of Morgan City, the Town of Berwick, the St. Mary Parish government, and the Governor of the State of Louisiana.[1]

- Plaintiff's job responsibilities included payables, expenses, accounts receivable, payroll, office management, and filing. When plaintiff was first hired, she was provided the Louisiana Public Bid Law and told to read it over and familiarize herself with it. Plaintiff acknowledges the District also has purchasing procedures in the handbook.[2] During her employment, plaintiff prepared a job description, which summarized all of her duties. These duties included advising management on, among other things, public bid law. She also solicited bids during her employment.

- Plaintiff testified the retaliation began in the first week of October 2008 and continued from then throughout her employment.[3]

- Plaintiff first complained about Hoffpauir's conduct in June 2009; the complaint was directed to Commissioner Raymond Wade, and Commissioner Deborah Garber.[4] Plaintiff reported to them that: (1) she had been previously forbid by Hoffpauir from speaking directly with the commissioners; (2) Hoffpauir was assigning duties which changed her plaintiff's description; (3) Hoffpauir was making unprofessional comments[5] about plaintiff and another employee, Cynthia Cutrera; and (4) Hoffpauir

---

[1] Although the District argues "all policymaking authority is vested in the Board," *see* Defendants' Statement of Material Facts, Doc. 28-2, at ¶1, the plaintiff disputes the foregoing, arguing Jerry Hoffpauir made changes to the policy manual, which was then sent to the Board's attorney for review to make sure it was legal. *See* Plaintiff's Statement of Material Facts, Doc. 30-2, at ¶1.

[2] *See* Deposition of Rebecca Conciennce, attached as Exhibit 1 to defendants' motion for summary judgment, Doc. 28, at p. 64.

[3] *See* Deposition of Rebecca Conciennce, attached as Exhibit 1 to defendants' motion for summary judgment, Doc. 28, at p. 16, 63, 30

[4] Plaintiff refers to the various Board members as "commissioners," while defendant refers to them as "Board members." The record shows the Board is comprised of nine commissioners; therefore, this Court will refer to the individual Board members as "Commissioners."

Although the parties have not clarified whether the June 2009 complaint was presented in written or oral form, it appears at the time the complaint was first made, it was communicated orally only to Commissioners Wade and Garber. The complaint does not appear to have been reduced to writing until some time later.

[5] The unprofessional comments alleged to have been made by Hoffpauir were that the plaintiff was "wild and trashy" and liked to "fish topless."

was using his authority to get plaintiff to take on his duties.[6]

- During the June 2009 meeting, plaintiff told Commissioners Garber and Wade they were not to address plaintiff's allegations concerning sexual comments with Hoffpauir.[7]

- In May or June 2009, Plaintiff called Commissioner Garber and told her Hoffpauir was incorrectly handling bids, and "procedures needed to be put into place." She did not tell Garber about any specific bid law violation and did not provide anyone at the District with documentation of any bid law violations. This was the only discussion plaintiff had with anyone about bid law issues.[8]

- Plaintiff explained Hoffpauir's legal violation as follows: "[P]ublic bid law stated that anything over $2,000.00 had to go out for three bids. Well, they never went out for three bids."[9]

- Plaintiff voiced her next complaint in July 2009 during a meeting with Commissioner Wade, Hoffpauir, and Commissioner Duane Lodrigue. This complaint stemmed from an argument between Plaintiff and Hoffpauir, during which plaintiff told Hoffpauir he was a "fucking miserable manager," he "failed as a manager," she "couldn't stand him," and she would "outlast him."[10]

- Plaintiff testified she believed it was necessary to have the July 2009 meeting in order to "move forward." Plaintiff reported she felt her June 2009 complaint about extra job duties had been turned around to make it look like she wanted more money. She

---

[6] *See* plaintiff's List of "Grievances Reported," attached as Exhibit 4 to defendants' motion for summary judgment, Doc. 28.

[7] *See* Deposition of Rebecca Conciennce, attached as Exhibit 1 to defendants' motion for summary judgment, Doc. 28, at pp. 92-94.

[8] *Id.* at pp. 30, 32-33, 58. At her deposition, plaintiff testified she attended a conference in June 2009 with Hoffpauir and Cynthia Cutrera. At this conference, the plaintiff learned any expenditure exceeding $2,000.00 was required to be let for three public bids. The plaintiff alleges she told Hoffpauir this, but he responded that he believed the policy to be that any expenditure over *$5,000.00* had to be let for bids. The plaintiff testified she informed Commissioner Garber that Hoffpauir was incorrectly handling bids, and she believed the District needed a procedure to address this. Plaintiff testified Commissioner Garber asked plaintiff to put her concerns in writing, but the plaintiff did not do so. Plaintiff argues she expected Garber to investigate and "get the specifics" on her own. *See* Plaintiff's Statement of Material Facts, Doc. 30-2, at ¶6.

[9] *Id.* at p. 36.

[10] *Id.* at pp. 100, 103; Exhibit 4. Plaintiff argues she filed the second complaint because Hoffpauir mocked her during a meeting and after plaintiff confronted Hoffpauir about the statement he made to fellow employee, Cynthia Cutrera, that plaintiff was "wild and trashy" and "fished topless." *See* Plaintiff's Statement of Material Facts, Doc. 30-2, at ¶8.

also stated the Board could keep any intended raise, because she just wanted to do "the job originally assigned to her." Plaintiff also requested a job description because she thought it would help Hoffpauir determine what her duties were.   There were also discussions about Ms. Cutrera and the job duties she was assigned.  At the July 2009 meeting, plaintiff did not allege that Hoffpauir had made any additional inappropriate comments.  This was the last complaint Plaintiff would make to any Board member while actively working.[11]

- Plaintiff testified that on January 25, 2010, Hoffpauir was frustrating her in a staff meeting, and plaintiff told Hoffpauir he was aggravating her and he was unprepared for work.  Plaintiff then told Hoffpauir she was sick of his behavior and went home. Plaintiff testified she left because she was "possibly going to attack [Hoffpauir], and [plaintiff] didn't want to go to jail."  This was plaintiff's last day of work at the District.  Plaintiff testified as of January 25, 2010, she had decided she could no longer work with Hoffpauir.[12]

- On January 26, 2010, plaintiff sent an email to Commissioner Wade, informing him she had decided to file a complaint against Hoffpauir with the EEOC.  Mr. Wade responded the same day, as follows:

> I was unaware of any problems and your email does not detail any particular issue.  We would like the opportunity to address any concerns with you.  Please put your grievances in writing so that we can attempt to remedy your complaints.
>
> Certainly, you have the right to file a complaint with the EEOC.  If you can provide specific details, we are ready and willing to remedy any problems.

- On February 2, 2010, the plaintiff responded to Mr. Wade's email with a list of "incidents" involving Hoffpauir, including the following:

    - Hoffpauir forwarded a sexual email to her, after which Hoffpauir immediately stated the email was sent in error and apologized.

---

[11] *Id.* at pp. 111-14, 119-120.  Plaintiff responds that she fully intended to voice all of her complaints at the July 2009 meeting with Commissioner Wade, but did not do so because she did not expect Hoffpauir and Commissioner Lodrigue to be present.  Plaintiff states at this meeting, Wade told plaintiff Hoffpauir was "not going anywhere."  Plaintiff states she did not voice additional complaints about Hoffpauir at that time because Hoffpauir was in the room.  *See* Plaintiff's Statement of Material Facts, Doc. 30-2, at ¶9.

[12] *See* Deposition of Rebecca Concienne, at p. 154; *see also* Exhibit 6, attached to defendants' motion for summary judgment, Doc. 28.

- Plaintiff received a job description and was advised her raise would have to wait until October 1 (plaintiff's one-year anniversary with the Board, when raises are typically first considered).

- In October, plaintiff's compensation was adjusted, but plaintiff did not receive a car allowance.

- On January 15, 2010, Hoffpauir said plaintiff was "going home for a nooner" in front of other individuals.

- On January 21, 2010, Hoffpauir told plaintiff she "had better not fuck with him today."

- After sending the list of incidents on February 2, 2010, plaintiff was contacted by Commissioner Lodrigue, who advised he would be in charge of investigating plaintiff's complaint.  Lodrigue met with plaintiff and they discussed some of the incidents described by plaintiff in her submission.[13]

- Thereafter, the District engaged in an investigation of Hoffpauir's actions.  After the investigation, Hoffpauir was disciplined in writing by the District.  Hoffpauir was expressly reprimanded for inappropriate discussions in the workplace and the forwarding of emails containing sexually inappropriate content.  Hoffpauir was advised any future conduct of this nature would result in further discipline, up to and including termination.  Hoffpauir was advised he was not to take any negative job action against plaintiff, no matter how small, without it being presented to Commissioner Lodrigue for review and approval.  Hoffpauir was further advised acts of retaliation against plaintiff were strictly prohibited and would result in discipline.[14]

- On February 26, 2010, the District issued a memo to the plaintiff, in which plaintiff was advised of the results of the Board's investigation.  Specifically, plaintiff was advised some of her allegations concerning sexually inappropriate comments and sharing of material were supported and being addressed with Hoffpauir, while others were not, and her remaining allegations of non-sexual conduct were also being addressed.  Notably, the Board informed the plaintiff: (1) plaintiff would not be charged any leave time for days she did not work during the period between her

---

[13] See Deposition of Rebecca Concienne at pp. 154-55., pp. 159-61,171-72.  Plaintiff responds that during the District's 30-day investigation, she was not asked about her allegations regarding kickbacks, expense report violations, ad bid law violations.  See Plaintiff's Statement of Material Facts, Doc. 30-2, at ¶12.

This Court notes for the record the list of "Incidents" prepared by the plaintiff and attached to her February 2, 2010 email to Mr. Wade does not mention kickbacks, expense report violations, or bid law violations.

[14] See Exhibit 12, Letter from Mr. Wade to Hoffpauir, dated February 26, 2010, attached as Exhibit 12 to defendants' motion for summary judgment.

complaint and the conclusion of the District's investigation; (2) plaintiff could return to work free of sexual comments, and she was told that if she did not want to report to Hoffpauir directly, she could report to another colleague for work issues; (3) no retaliatory action would be permitted, and if she felt subjected to any inappropriate behavior, she should immediately notify the Board; (4) plaintiff was counseled regarding issues relating to her pay raise – which were matters controlled by the Board, not Hoffpauir – and was informed Hoffpauir had offered to forego a pay raise in order to allow plaintiff to have her compensation increased; (5) plaintiff was advised Hoffpauir was tasked with day-to-day management of the District, and plaintiff was expected to follow the chain of command unless she had a complaint related to discrimination or retaliation; and (6) plaintiff was counseled for speaking harshly and insubordinately to Hoffpauir, using profanity in the workplace, and refusing to perform reasonable work requests. Finally, plaintiff was advised that the Board looked forward to her prompt return to work.[15]

- Plaintiff quit her job because: (a) she was still going to have to work with Hoffpauir and (b) "the Board wasn't going to do anything about him." Plaintiff testified she felt that it was not an appropriate solution to allow Hoffpauir to stay working in the office.[16]

In addition to the foregoing undisputed facts, there is the disputed issue concerning alleged "kickbacks." In a previous filing, the plaintiff argued she informed Commissioner Lodrigue that Hoffpauir was "taking kickbacks from Port work." However, in the instant motion, the defendants contend there is no evidence plaintiff ever reported anything about "kickbacks" to any commissioner, and, in fact, plaintiff actually testified she only discussed "kickbacks" with Hoffpauir himself, as follows:

Q: Did you tell Deborah Garber about the kickbacks?
A: No, sir.
Q: **In fact, you didn't tell anyone at the Port about the kickbacks, did you?**
A: **Just Jerry [Hoffpauir]. I only talked to Jerry about doing bid law wrong, he knew exactly what he was doing. I was hoping that he would stop.**
Q: And when you say you talked to Jerry about it, all you told Jerry was that he

---

[15] This Court has attached the memorandum to this Ruling as Exhibit "A."

[16] *See* Deposition of Rebecca Concienne at pp. 175, 178 (emphasis added). It is unclear to this Court on what date the plaintiff quit her job.

-6-

was doling the bid law wrong, correct?

A:    M - hm (affirmatively).

        MR. DUVAL:      Yes.

A.    Yes.[17]

Defendants filed a motion for summary judgment on January 18, 2012, however, that motion was denied because the Court could not conclude what specific claims had been pled by the plaintiff. Specifically, the Court noted the plaintiff had filed a *pro se* petition in state court, which petition was crafted in outline form and failed to set forth the basis in law for the claim(s), failed to set forth the specific factual basis of each alleged claim, and failed to specifically indicate what remedy was sought for each alleged claim. Although plaintiff retained counsel after the matter was removed to this Court, and although her attorney filed a Supplemental and Amended Complaint, the Supplemental and Amended Complaint merely adds additional claims and does not attempt to clarify the "claims" that were pled by the plaintiff in her *pro se* petition. It was also unclear whether, and to what extent, the doctrine of qualified immunity might to apply to any of the "claims" pled by the plaintiff. Therefore, this Court denied the motion for failure of both parties to carry their burden.[18] Plaintiff was ordered to file an outline of all claims pending in this lawsuit, and defendant was ordered to file a responsive outline. Upon the filing of the foregoing outlines, it was ordered that the defendant could re-urge a motion for summary judgment or other dispositive motion.

On March 23, 2012, defendants filed the instant motion for summary judgment. In their motion, defendants rather conclusorily argue they are entitled to "judgment as a matter of law," apparently seeking dismissal of all claims alleged by the plaintiff, but fail to identify the law which

---

[17] *Id.* at pp. 66-67. As will be explained later in the Ruling, this Court believes the plaintiff has conflated her complaints concerning "bid law violations" and "kickbacks."

[18] *See* Memorandum Ruling and Order, Docs. 24 & 25.

might support their conclusory argument.

## II.   Law and Argument

### A.   Summary Judgment Standard

"A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV. PROC. 56(b).  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PROC. 56(c).

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

FED. R. CIV. PROC. 56(e).

As summarized by the Fifth Circuit in *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir. 1994):

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). However, where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. Id. at 322; *see also, Moody v. Jefferson Parish School Board*, 2 F.3d 604, 606 (5th Cir.1993); *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir.1991). Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The Supreme Court has instructed:

> The plain language of Rule 56(c) <u>mandates</u> the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Where no such showing is made, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."
>
> . . . .
>
> . . . In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint. As set forth above, Rule 56(e) provides that judgment "shall be entered" against the nonmoving party unless affidavits or other evidence "set forth specific facts showing that there is a genuine issue for trial." The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.

*Lujan v. National Wildlife Federation*, 497 U.S. 871, 884, 888-89 (1990)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

The Fifth Circuit has further elaborated:

> [The parties'] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. ...[S]ummary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*)(citations and internal quotations omitted).

Finally, in evaluating evidence to determine whether a factual dispute exists, "credibility determinations are not part of the summary judgment analysis." Id. To the contrary, "in reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001).

### B.   Plaintiff's Claims

As best this Court can determine – and the task has not been an easy one – the plaintiff has alleged the following claims: (1) First Amendment retaliatory discharge claim, which arises under 42 U.S.C. §1983, against both the District and Hoffpauir; (2) a "hostile work environment" claim against the District; with respect to this claim, plaintiff fails to identify the law under which the claim is brought (*i.e.*, Title VII, some other federal law, or state law); (3) a "whistleblower" claim against the District and Hoffpauir, which arises under Louisiana Rev. Stat. §23:967;[19] and (4) a claim for intentional infliction of emotion distress arising under Louisiana law; here also, plaintiff does not specify whether the claim is alleged against the District, Hoffpauir, or both.

### 1.   Plaintiff's Title VII Claims

In their motion for summary judgment, the defendants seek summary judgment on plaintiff's Title VII claims, arguing "plaintiff concedes she has no Title VII claim." Indeed, in her response to the first motion for summary judgment filed by defendants, plaintiff responded: "Through discovery,

---

[19] Although defendants argue in their motion that the plaintiff has also alleged her whistleblower claim under La. Rev. Stat. §42:1169, this Court was unable to locate any reference to that particular statute in plaintiff's outline of claims, filed on March 5, 2012 [Doc. 26]. Additionally, although defendants argue the plaintiff has alleged a general negligence claim, this Court was unable to locate such claim in plaintiff's outline. Regardless, both claims sound in Louisiana state law, and for the reasons that follow, this Court declines to exercise its supplemental jurisdiction over plaintiff's state law claims.

Concienne has learned that the District does not have the requisite number of employees to qualify as an 'employer' under Title VII.  Therefore, Concienne is in agreement with the District that her claim under Title VII should be dismissed."[20]

The position of the parties is well-grounded in law and fact.  Title VII defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding year."  42 U.S.C. §2000e(b).  Defendants argue at no point in 2009 or 2010 did the District employ fifteen or more employees in twenty or more calendar weeks, and the plaintiff does not dispute this.

Considering the foregoing, to the extent the plaintiff has pled any claims under Title VII in her complaint, such claims are DENIED AND DISMISSED WITH PREJUDICE.

Considering the foregoing, the only remaining *federal* claim in this matter is plaintiff's claim for  First Amendment retaliatory discharge.  Indeed, plaintiff has not alleged a basis in *federal* law for her hostile work environment claim.  To the extent the claim arises under Title VII, plaintiff has acknowledged such claim must be dismissed.  To the extent the claim arises under some other federal law, the plaintiff has failed to identify such law, despite being given two opportunities to do so.  Finally, to the extent the claim arises under state law, this Court has discretion to decline to exercise supplementary jurisdiction over the possibly alleged claim should plaintiff's federal claims fall away.  *See, e.g., Smith v. Amedisys, Inc.*, 298 F.3d 434, 446 (5th Cir. 2002) (after dismissing plaintiff's Title VII claims, it was appropriate for court to consider whether it could exercise supplemental jurisdiction over plaintiff's remaining state law claims).  For the same reason, this Court has discretion to decline to exercise supplementary jurisdiction over plaintiff's possibly

---

[20] *See* plaintiff's opposition memorandum, Doc. 22, at p. 10.

alleged "whistleblower" claim, as well as her claim for intentional infliction of emotion distress, both of which arise under Louisiana law.

A trial court's decision to retain jurisdiction over pendent state law claims is reviewed for abuse of discretion. *Amedisys*, 298 F.3d at 446, *citing McClelland v. Gronwaldt*, 155 F.3d 507, 519 (5th Cir. 1998). A district court's review of the matter is guided by the statutory provisions of 28 U.S.C. §1367(c) and the balance of the relevant factors of judicial economy, convenience, fairness, and comity. *Amedisys*, 298 F.3d at 446-47, *citing Batiste v. Island Records, Inc.*, 179 F.3d 217, 227 (5th Cir. 1999). The "general rule" is to decline to exercise jurisdiction over pendent state-law claims when all federal claims are dismissed or otherwise eliminated from a case prior to trial, however that rule is neither mandatory nor absolute." *Amedisys*, 298 F.3d at 447.

Considering the foregoing, should this Court determine that the plaintiff's federal law claims require summary dismissal, this Court will consider whether it should exercise supplemental jurisdiction over plaintiff's pendent state law claims.

### 2.        Plaintiff's First Amendment Retaliatory Discharge Claim

Plaintiff, it seems, alleges a §1983 claim for retaliatory discharge arising under the First Amendment against both the District and Hoffpauir. In response, defendants argue Hoffpauir is entitled to qualified immunity on this claim, and the District cannot be liable under §1983 on the basis of *respondeat superior*. Neither disputes Hoffpauir would have been acting under color of state law.

### a.        Qualified Immunity

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) the official violated a statutory or constitutional right, and (2) the right was

'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, – U.S. –, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011) (internal citation omitted).  Courts have discretion to decide which of the two prongs of qualified immunity to tackle first. *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009).  Therefore, qualified immunity protects government officials performing discretionary functions from individual liability for civil damages but only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Thompson v. Upshur Cnty.*, 245 F.3d 447, 456 (5th Cir. 2001).  When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense.  *See Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir.2001), *citing McLendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002). Thus, this Court must determine whether plaintiff has demonstrated Hoffpauir violated a clearly established statutory or constitutional right.

To establish a First Amendment retaliation claim under §1983, the plaintiff must prove four elements: (1) she suffered an adverse employment action, (2) her speech involved a matter of public concern, (3) her interest in commenting on the matter of public concern outweighed the defendant's interest in promoting efficiency, and (4) her speech was a substantial or motivating factor behind the defendant's actions.  *Modica v. Taylor*, 465 F.3d 174, 179–80 (5th Cir.2006); *see also Harris v. Victoria Independent School District*, 168 F.3d 216, 220 (5th Cir.1999). "Whether [the plaintiff] engaged in protected speech is a purely legal question...." *Charles v. Grief*, 522 F.3d 508, 512 (5th Cir.2008).

The Supreme Court's decision in *Garcetti v. Ceballos*, 547 U.S. 410, 126 S.Ct. 1951 (2006)

added a threshold layer to the analysis of whether a public employee has spoken as a citizen on a matter of public concern – namely, a determination of whether the plaintiff spoke pursuant to his or her official duties. *Davis v. McKinney*, 518 F.3d 304, 311 (5th Cir. 2008), *citing Garcetti*, 547 U.S. at 421, 126 S.Ct. 1951. The *Garcetti* Court concluded "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421, 126 S.Ct. 1951. The rationale behind the rule is that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421–22. Thus, "before asking whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking 'as a citizen' or as part of her public job." *Davis*, 518 F.3d at 312, *quoting Mills v. City of Evansville*, 452 F.3d 646, 647 (7th Cir.2006). Thus, in this analysis, the court's focus is not on the speech's content, but rather "the role the speaker occupied when he said it." *Id.*

Thus, after *Garcetti*, the proper analysis concerning whether an employee's speech is constitutionally protected involves three considerations, as follows:

> First it must be determined whether the employee's speech is pursuant to his or her official duties. If it is, then the speech is not protected by the First Amendment. Second, if the speech is not pursuant to official duties, then it must be determined whether the speech is on a matter of public concern. Third, if the speech is on a matter of public concern, the Pickering test must be applied to balance the employee's interest in expressing such a concern with the employer's interest in promoting the efficiency of the public services it performs through its employees. (Footnotes and citations omitted).

*Davis v. McKinney*, 518 F.3d 304, 312 (5th Cir. 2008), *citing* Ronna Greff Schneider, 1 Education

Law: First Amendment, Due Process and Discrimination Litigation §2:20 (West 2007).

In *Elizondo v. Parks*, 431 Fed. Appx. 299, 303 (5th Cir. 2011), an unpublished case that has no precedential value but which this Court nevertheless finds instructive, the Fifth Circuit noted several non-dispositive factors which aid in determining the role the speaker occupied when he allegedly uttered the protected speech, as follows:

> Several non-dispositive factors aid in an analysis of the speaker's role, including the internal versus external nature of the speech and whether the subject matter concerned the speaker's employment. Formal job descriptions, although relevant, are not dispositive, as they "often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." Rather, the inquiry is a "practical one," and the controlling factor is whether the plaintiff's expressions were made *pursuant to* one of the numerous duties for which the plaintiff was employed.

(internal citations omitted) (emphasis added).

The Fifth Circuit has interpreted the "pursuant to" language in *Garcetti*. In *Williams v. Dallas Independent School District*, 480 F.3d 689, 693 (5th Cir. 2007) (per curiam), the Fifth Circuit was called upon to determine the extent to which a public employee's speech was protected if his speech was not necessarily required by his job duties but was nevertheless related to them. In Williams, the court held "[a]ctivities undertaken in the course of performing one's job are activities pursuant to official duties." *Williams* concerned an athletic director's memoranda to school officials in which he requested account information concerning the fulfillment of his daily job duties, namely budgeting for athletic department expenses. *Id.* at 694. The court found the director's speech unprotected because, although the director's duties did not specifically require him to write the memoranda, he performed this activity in the course of carrying out his official duties. *Id.*; *see also Davis v. McKinney*, 518 F.3d 304, 315 (holding an audit manager's letter discussing concerns about

the inadequate response of her employer to her internal investigation was not protected speech under *Garcetti*); *Nixon v. City of Houston*, 511 F.3d 494, 498–99 (5th Cir.2007) (holding a police officer's comments at a crime scene to the media were made during the "course of performing his job" and were not protected). Thus, since *Garcetti*, the Fifth Circuit court has repeatedly held statements made in the course of performing one's job are not protected.

In the instant case, a central focus of the plaintiff's claim for retaliatory discharge under the First Amendment is the identification of the plaintiff's alleged protected speech. In her Outline of Claims, the plaintiff sets forth a list of facts she will use to prove up her retaliatory discharge claim, yet none of the facts proferred contains a concise description of the *speech* plaintiff alleges is protected. In their motion for summary judgment, the defendants argue the alleged "protected speech" is plaintiff's reporting of Hoffpauir for violation of Louisiana's public bid law and "other violations."

In an effort to identify the plaintiff's speech for purposes of the Court's analysis, a review of the record shows plaintiff made two formal complaints while employed by the District. The first complaint, lodged in June 2009, set forth the following complaints:

- "I reported that I was forbid from telling commissioners anything by the Executive Committee." (sic)

- "I reported the fact that he was assigning duties that were changing my job description and he refused to address it by telling me he decided what my duties were."

- "I reported that he was stating unprofessional comments about me to Mrs. Cutrera and comments about her to me. (Some sexual in nature, others just degrading comments.)"

- "I reported that the Executive Director was using the Executive Director position as leverage to get us to take on his duties because he had offered it to both me and Mrs.

-16-

Cutrera."[21]

Plaintiff's second complaint, lodged in July 2009, came about after an argument between plaintiff and Hoffpauir, in which plaintiff testified she told Hoffpauir he was a " fucking miserable manager," he "failed as a manager," she "couldn't stand" him, and she would "outlast him."  In her July 2009 complaint, the plaintiff set forth the following grievances:

- "I reported that my complaint about the duties assigned was turned around to look like I just wanted more money."

- "I reported that they could keep the raise, that I just wanted to do the job I was given."

- "I reported that I requested a job description because I thought it could help Jerry with determining what my job duties were."
- "I reported that I and the Executive Director argued about the inappropriate comments had said about me and I had asked him to stop."[22]

Omitted from the plaintiff's formal complaints are any references to complaints that Hoffpauir was mishandling the District's bid policy or getting kickbacks for Port work.  Indeed, plaintiff's allegations concerning "bid law violations" and/or "kickbacks" is less than clear.  In her Affidavit attached to her opposition brief, plaintiff states she told Hoffpauir, Ms. Cutrera, and Commissioner Garber about "bid law violations," namely, that "Hoffpauir was doing bid law wrong."  Plaintiff admittedly provides few specifics concerning how Hoffpauir violated bid policy, because, as she states in her Affidavit, plaintiff expected Commissioner Garber to uncover the specifics of how Hoffpauir was handling bids improperly.  However, plaintiff does state in her Affidavit that the bid law violations "included numerous invoices that were increased to include

---

[21] *See* "Grievances Reported," attached as Exhibit 4 to defendants' motion for summary judgment.

[22] *Id.*

kickbacks for Jerry Hoffpauir." In this manner, the plaintiff appears to have conflated the issue of "bid law violations" and "kickbacks."

Later in her Affidavit, plaintiff alleges in February 2010, she reported to Commissioner Lodrigue that Hoffpauir was "taking kickbacks from Port work." According to the plaintiff:

> [t]he kickbacks included Hoffpauir getting the Ledet Brothers Contractors to do work on his home for free labor (such as roof repair, carpet removal, air conditioner leaks, and to build a fishing cabinet). Hoffpauir also told contractors to put a little extra in their invoice for him, to remember not to go over his approval limit of $5,000. Hoffpauir was not getting three quotes for purchases between $2,000 and $5,000 as required by Section D of the District['s] Purchasing Procedures found in the District's manual.[23]

Again, the foregoing allegation appears to indicate that, although plaintiff refers to "bid law violations" and "kickbacks" as two separate things throughout her filings, the plaintiff is actually conflating the two concepts, or, at the very least, using the terms "bid law violations" and "kickbacks" interchangeably throughout her filings.

The plaintiff has given conflicting testimony on the subject of "bid law violations" and "kickbacks." Despite the statements in her Affidavit – which indicate plaintiff shared her complaints about "bid law violations" and "kickbacks" with Hoffpauir, Ms. Cutrera, and Commissioner Garber, at her deposition, the plaintiff specifically testified she told *only Hoffpauir* about his alleged mishandling of the District's bid policy in response to a question about "kickbacks." Furthermore, the plaintiff did not reference either "bid law violations" or "kickbacks" in her list of complaints that she submitted to the District in June/July 2009. Rather, the plaintiff appears to acknowledge she did not lodge complaints regarding either "bid law violations" or "kickbacks" with the District:

      Q:    Did you tell Deborah Garber about the kickbacks?

---

[23] *See* Affidavit of Rebecca Concienne, attached as Exhibit "A" to plaintiff's opposition brief, Doc. 30.

A:     No, sir.

Q:     **In fact, you didn't tell anyone at the Port about the kickbacks, did you?**

A:     **Just Jerry [Hoffpauir].   I only talked to Jerry about doing bid law wrong, he knew exactly what he was doing.  I was hoping that he would stop.**

Q:     And when you say you talked to Jerry about it, all you told Jerry was that he was doling the bid law wrong, correct?

          A:     M - hm (affirmatively).

          MR. DUVAL:     Yes.

A.     Yes.[24]

With respect to the changing of expense reports, plaintiff alleges she was asked to "change" an employee's mileage report, which she refused to do, and as a result of her refusal, she was "constantly harassed by Hoffpauir" up until she resigned her employment.

The plaintiff argues "the speech concerning refusal to participate in an illegal activity (bid law, falsifying expense reports, kickbacks) is a matter of public concern because it discloses misbehavior by public officials."  However, as instructed by the Fifth Circuit, before this Court reaches the issue of whether the speech is a matter of public concern, this Court must first determine whether the plaintiff uttered the speech in her role as an *employee* or as a *private citizen*.

Based on her own direct testimony at her deposition, it is clear from the record the plaintiff made all of her comments internally, directly to a supervisor (either to Hoffpauir himself or to Commissioner Garber, as alleged by the plaintiff), and during work hours.  Furthermore, the subject matter of the speech concerned the manner in which plaintiff performed her job duties as well as the manner of plaintiff' continued employment. Plaintiff's statements and complaints were primarily directed at her own dissatisfaction with her job, and focused on steps that could be taken to improve her job situation, or were directed at clarifying her job responsibilities and/or the company's policies.

---

[24] *See* Deposition of Rebecca Concienne at pp. 66-67 (emphasis added).

Indeed, all of the plaintiff's *reported* complaints address the scope of plaintiff's job duties, the chain of command within the District, plaintiff's salary, and a specific pay raise that was being discussed. Additionally, the plaintiff complained about "unprofessional comments" (some sexual in nature, while other were "just degrading comments").  To the extent plaintiff complained about bid law violations and kickbacks, it is clear she was doing so as a *subordinate employee* of the employee about whom she was complaining, an individual with whom the plaintiff had many disagreements. Importantly, the plaintiff does not allege she made her complaints to the general public or that she discussed her complaints about Hoffpauir externally at all, *i.e.*, to individuals outside the District. *Cf. Charles v. Grief*, 522 F.3d 508 (5th Cir. 2008) (concluding terminated African-American employee of state lottery commission spoke as a private citizen when he complained about racial discrimination to Texas state legislators, noting "Charles's speech – unlike that of the plaintiffs in *Garcetti* and *Williams* – was not made in the course of performing or fulfilling his job responsibilities, was not even indirectly related to his job, and was not made to higher-ups in his organization . . . but was communicated directly to elected representatives of the people[,]" and "the persons to whom Charles directed his e-mails further distinguishes his speech from that of the plaintiffs in *Garcetti* and *Williams*: Charles voiced his complaints externally, to Texas legislators who had oversight authority over the Commission, not internally, to supervisors.").

While the foregoing factors are not dispositive, they weigh in favor of finding that plaintiff was speaking pursuant to her job duties. *See Garcetti*, 547 U.S. at 420–21, 126 S.Ct. 1951; *see also Grief*, 522 F.3d at 514 (emphasizing that the plaintiff voiced his concerns externally, a significant distinction from the speech at issue in *Garcetti*.).  The *Garcetti* Court concluded "when public employees make statements pursuant to their official duties, the employees are not speaking as

citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421, 126 S.Ct. 1951.  The facts and evidence of and surrounding Ms. Concienne's statements are not disputed; based on the evidence put before the Court on the instant motion, this Court concludes the plaintiff was speaking as a District employee, and therefore, she was not speaking as a citizen for First Amendment purposes when she was complaining about working for Hoffpauir.

The Fifth Circuit has held if it is determined an employee's speech is pursuant to his or her official duties, then the speech is not protected by the First Amendment, and the Court's inquiry ends. *Davis v. McKinney*, 518 F.3d 304, 312 (5th Cir. 2008).  Considering the foregoing, this Court concludes plaintiff's statements at issue here are not protected by the First Amendment under *Garcetti*.  Because this Court concludes *Garcetti* precludes the plaintiff's First Amendment retaliation claim, Hoffpauir is, therefore, entitled to qualified immunity on the plaintiff's First Amendment retaliation claim, because there was no violation of a statutory or constitutional right.

> **b.      The District cannot be liable under Section 1983 under a theory of *respondeat superior***

Having concluded that Hoffpauir is entitled to qualified immunity on plaintiff's First Amendment retaliation claim, this Court must consider whether the Morgan City Harbor and Terminal District itself is entitled to summary dismissal of the plaintiff's First Amendment retaliation claim, which was also lodged against it.[25]

A local government entity cannot be held liable under §1983 on the theory of *respondeat superior,* and indeed, a municipality is almost never liable for an isolated unconstitutional act on the

---

[25] Again, neither party disputes the Morgan City Harbor and Terminal District would, for these purposes, be considered the municipality.

part of an employee; it is liable only for acts directly attributable to it through some official action or imprimatur." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009).  Thus, governmental liability under §1983 must be premised on a government policy or custom that causes the alleged constitutional deprivation. *Gates v. Texas Dept' of Protective And Regulatory Servs.*, 537 F.3d 404, 436 (5th Cir. 2008).  To establish such liability under Section 1983, a plaintiff must prove: (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right. *Id.* Plaintiff must demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. *Board of the County Commissioners v. Brown*, 520 U.S. 397, 403 (1997).  Only those municipal officers who have final policymaking authority may by their actions subject the government to Section 1983 liability. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988).  Inaction by a governmental body is insufficient. *Flores v. Cameron County*, 92 F.3d 258, 269 (5th Cir. 1996) ("the fact that the official policymaker simply goes along with a subordinate's discretionary decisions is not a delegation of policymaking authority").

Here, the plaintiff does not allege the District created any policy or otherwise engaged in any affirmative conduct that prompted her to quit.  Rather, the plaintiff appears to argue there is §1983 liability on the part of the District because she reported illegal activity to the District – including "bid law violations" and "kickbacks" – and the District ignored those complaints and investigated only her sexual harassment complaints.  However, a predicate to a finding of §1983 liability against a government entity is *the finding of a statutory or constitutional violation*.  Because this Court concludes there was no violation of a statutory or constitutional right in connection with the plaintiff's "speech" – and the plaintiff's speech, therefore, was not protected under the First

Amendment – this Court concludes there can be no §1983 liability on the part of the District.

For the foregoing reasons, the plaintiff's First Amendment retaliation claims against Hoffpauir personally and against the District are DENIED AND DISMISSED WITH PREJUDICE.

**4.      This Court declines to exercise supplemental jurisdiction over the plaintiff's remaining state court claims**

A trial court's decision to retain jurisdiction over pendent state law claims is reviewed for abuse of discretion. *Amedisys*, 298 F.3d at 446, *citing McClelland v. Gronwaldt*, 155 F.3d 507, 519 (5th Cir. 1998).  A district court's review of the matter is guided by the statutory provisions of 28 U.S.C. §1367(c) and the balance of the relevant factors of judicial economy, convenience, fairness, and comity. *Amedisys*, 298 F.3d at 446-47, *citing Batiste v. Island Records, Inc.*, 179 F.3d 217, 227 (5th Cir. 1999). The "general rule" is to decline to exercise jurisdiction over pendent state-law claims when all federal claims are dismissed or otherwise eliminated from a case prior to trial, however that rule is neither mandatory nor absolute." *Amedisys*, 298 F.3d at 447.

In the instant case, this Court has determined plaintiff's First Amendment retaliation claims against both Hoffpauir personally and the District fail as a matter of law.  Consequently, this Court must consider whether it should retain jurisdiction over plaintiff's pendent state law claims alleging, generically, a hostile work environment, violations of Louisiana whistleblower law, and Louisiana-based intentional infliction of emotional distress (and, to the extent she so pled, plaintiff's claim for negligence).

28 U.S.C. §1367(c) provides:

The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if–

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

The instant case involves primarily two federal claims (plaintiff's Title VII claims – which plaintiff concedes fail as a matter of law – and plaintiff's First Amendment retaliation claim, which this Court has dismissed) and at least three remaining state law claims.  This Court concludes the plaintiff's state law claims predominate the federal claims.  This Court has already dismissed the claims over which it has original jurisdiction and believes the remaining claims are better addressed by the state courts.  This case has neither progressed so far that this Court believes it would be equitable to continue with the proceedings in this venue, nor does this Court believe a sense of fairness requires that the case continue in federal court.  This Court believes the state courts, applying state law with which they are eminently familiar, should adjudicate the plaintiff's state law claims.  The foregoing reasons justify this Court's discretionary decision to decline to exercise its supplemental jurisdiction over the remaining state law claims and remand this matter to the state court from which it was removed.

Considering the foregoing, it is ORDERED that defendant's motion for summary dismissal of plaintiff's state law claims is DENIED, and this matter is REMANDED to the 16th Judicial District Court for the Parish of St. Mary, Louisiana.

## III.   Conclusion

For the foregoing reasons,

IT IS ORDERED that to the extent the plaintiff has pled any claims under Title VII in her complaint, defendants' motion to dismiss such claims is GRANTED, and such claims are DENIED AND DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Hoffpauir is entitled to qualified immunity on the plaintiff's First Amendment retaliation claim, because there was no violation of a statutory or constitutional right.   Considering the foregoing, defendants' motion to dismiss plaintiff's First Amendment retaliation claim against Hoffpauir is GRANTED, and the foregoing claim is DENIED AND DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that defendants' motion to dismiss plaintiff's First Amendment retaliation claim against the District is GRANTED, and the foregoing claim is DENIED AND DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that defendants' motion for summary dismissal of plaintiff's state law claims is DENIED, and this matter is REMANDED to the 16th Judicial District Court for the Parish of St. Mary, Louisiana.

IT IS FURTHER ORDERED that the parties shall submit a Final Judgment, approved as to form, within ten days of the date of this Ruling.

THUS DONE AND SIGNED in Lafayette, Louisiana, this _____18_____ day of July 2012.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE